**E. O. BATTLES, Appellant,**

**v.**

**Houston H. ADAMS et al., Appellees.**

**No. 11472.**

Court of Civil Appeals of Texas.

Austin.

May 10, 1967.

Rehearing Denied May 31, 1967.

F. L. Kuykendall, Kuykendall & Kuykendall, Austin, for appellant.

Leon F. Steinle, Steinle & Davis, Jourdanton, for appellee Loyd C. Sivert.

A. L. Truex, Llano, for appellee Houston H. Adams.

HUGHES, Justice.

E. O. Battles, appellant, as purchaser under a contract of sale of a tract of land in Llano County owned by Loyd C. Sivert and wife Theresa K. Sivert, deposited $4,750.00 as earnest money with Houston H. Adams, a licensed real estate agent. The sale was not consummated and this suit was instituted by Battles against Mr. Sivert and Adams for the return of the $4,750.00 earnest money. Adams paid this sum of money into the registry of the trial court. After a non-jury trial, judgment was rendered denying Battles recovery and decreeing that Adams recover $2,500.00 of such amount and that Sivert recover the balance of $2,250.00.

Appellant's first point is that since Sivert had pointed out to Battles the east boundary of the 5½ acre (approximate) tract involved and Sivert later entered into a boundary agreement with an adjoining owner to the east, thereby reducing the water frontage by 27½ feet, that the trial court erred in holding the contract enforceable.

Mr. and Mrs. Sivert owned a 5½ acre tract of land on the Llano River in Llano County known as the Rio Vista Camp. They listed this property for sale with Adams, a licensed real estate agent. On May 1, 1965, a contract for the sale of this property was entered into between Mr. Sivert and Battles.

The description of the property to be conveyed as contained in the contract was:

"Rio Vista Camp, consisting of approximately 5½ acres of land situated on the Llano River in Llano County, Texas, near Kingsland, lying adjacent to lands owned by J. E. Tumlinson on the one side, and by Woodrow McDougall on the other, and being the only lands owned by Loyd C. Sivert and wife, in Llano County, Texas."

It is undisputed that there was uncertainty regarding the ground location of the dividing line between the Sivert and McDougall properties. After the execution of the contract of sale, Mr. Battles requested a survey be made of this disputed line. This survey was made by Surveyor Lanning. Following this survey, Mr. Sivert and his neighbor Mr. McDougall entered into a boundary agreement regarding the line dividing their properties the effect of which was that Sivert gave up from eight or nine feet to twenty-seven and one half feet of waterfront property to Mr. McDougall. Mr. Battles did not consent to this boundary agreement. We quote from the testimony of Mr. Battles:

"Q Now, has Mr. Sivert, at any time, failed or refused to deliver to you what he agreed to deliver and convey to you under the terms of that contract?

A I think so.

Q How so?

A Because of the survey. The survey he had made was twenty-seven and a half foot different from what the two owners agreed on.

Q They didn't say at any time that was an agreed property line, did they? Didn't he tell you it was simply the way they were going to use the property in that manner of the division?

A No, I understood that they got together over here in Llano and agreed on this second line, or the second survey. The surveyor told me, to start with, that he couldn't— and I heard him tell Mr. Bruhl— that he couldn't certify that survey to change it to anywhere other than what it surveyed out, the first time, but he told me, the second time, that he made his second survey that he made he told me he could put a property line anywhere the two owners told him to.

* * * * * *

A The surveyor put a stake down, yes.

Q When?

A When he surveyed.

Q Well, where did he put the stake down?

A Twenty-seven and a half feet from there further east than it is now.

* * * * * *

Q What do you know about it?

A I know that Mr. Lanning went down there and made a survey according to the first two stakes he found, he had his field notes, and it was twenty-seven—I may be wrong on those figures, but, anyway, the notes said twenty-seven west and something else to a line on the water front, and he taken these two stakes and run a survey, and he come out twenty-seven and a half foot from where it is now further east.

Q Who, out twenty-seven and a half feet further east?

A Mr. Lanning did.

Q Are you talking about a survey that was made by R. H. Gibson in 1959?

A No, sir.

Q Are you saying Mr. Lanning went out there in 1959?

A Mr. Lanning went out there in 1965.

Q All right. And then did Mr. Lanning set his stakes twenty-seven and a half feet farther east?

A He just set a stake under the house and it was twenty-seven and a half foot farther east than the second survey that the two owners agreed on.

Q Did Mr. Lanning tell you that was the property line—that property

line twenty-seven and a half feet east?

A That's right.

\* \* \* \* \* \*

Q Do you know why he changed his mind?

A He told me because the two owners, McDougall and Sivert, had him change it over there—to put it over there."

Mr. Battles testified that he and another person measured the distance between the first stake set by the surveyor following a survey and the second stake set after the boundary agreement between Mr. Sivert and Mr. McDougall and the distance was about twenty-seven and one half feet.

Mr. Sivert testified:

"Q Now, afterwards, about May 25, 1965, you and Mr. McDougall settled your differences as to the boundary line by executing an agreed boundary line, did you not?

A At one time. And it had been surveyed, but the survey wasn't recorded, and I figured—I thought it had changed—

Q How far west was the agreed-upon boundary line from what you thought your east boundary line was, approximately?

A I didn't measure it. I'd say it was eight or nine feet.

Q Eight or nine feet?

A Right, that would get it.

Q So, actually, when you entered into this boundary line agreement, you accepted less front footage than you had thought you owned, by eight or nine feet.

A Approximately so, I think we had agreed on the sale before we ever come to the boundary dispute.

Q I understand. But after this instrument of contract was executed, you and Mr. McDougall entered into a boundary line agreement which meant that you had eight or nine feet less waterfrontage than you had thought you had?

A Yes."

Mr. Adams testified:

"Q Were you present when Mr. Lanning, the surveyor, went out on this property and put down a stake which was farther up in the direction—into the house—not into the house but twenty-seven and a half feet east of what the property—present property line is?

A I was there, yes.

Q When he put down that stake?

A Yes, I was there."

We quote further from the testimony of Mr. Battles:

"Q After you discovered that, that Mr. Sivert didn't own, or had given up portions of the property that he owned by this boundary line agreement and fixing the new survey line, did you have a conversation with Mr. Sivert about the loss of water front footage?

A Yes, I objected to it.

Q What was the conversation had with Mr. Sivert regarding that matter?

A Well, I told him that we were losing some property there, and that I expected reimbursement—or exactly how I stated and worded that I couldn't say exactly, but I told him that I wasn't getting the property and, therefore, I could not pay as much for over-all property but I would pay as much per foot on what I was getting.

Q In other words, you asked for an adjustment in the purchase price because of the loss of the front footage—water frontage?

A Yes, sir."

Mr. Sivert was asked the following question and answered as indicated:

"Q But, at any rate, whether you saw the letter or not, you did recognize there was a dispute between you and Mr. Battles about the water front footage—water frontage on the property that you were intending to sell him, and that, as a consequence, you were willing—because of that difference—dispute—on your own admitted testimony that there was eight or nine feet less frontage than you had thought you had, you did agree to reduce the purchase price by $1500.00, didn't you?

A Yes, sir."

This question and answer were objected to on the ground that it related to a compromise, and the objection was sustained. No motion to strike was made.

The testimony was clearly admissible to show the materiality of the effect of the boundary agreement.

Since the objection to this testimony was made after its admission and no motion to strike having been made, the objection was waived and the testimony was before the court for all that it is worth. Valdez v. O'Connor, 17 S.W.2d 835, Tex.Civ.App., San Antonio, n. w. h., Poole v. State Highway Department, 256 S.W.2d 168, Tex. Civ.App., Fort Worth, writ dismissed.

We direct attention to the following testimony of Mr. Adams referring to an incident prior to the execution of the contract:

"Q All right. And what did you and Mr. Sivert and Mr. Battles discuss out there? What did you tell him and what did he tell you?

A We discussed the property in general and what went with the property, and Mr. Battles was interested in knowing where, about, or approximately where the division line was on the five acre piece of property, and which Mr. Sivert told him at that time, and I also told him it would be impossible to tell where the division line was without a survey, that he didn't have a survey, plat, or field notes, or anything showing that the property had been surveyed; he didn't know where the division would be without a survey. Mr. Battles stated that: 'I'm not interested in a survey. I have always gotten along with my neighbors and I think I can get along with this neighbor. I am ready to go on and contract to buy the property.'

Q Did Mr. Sivert—. You heard his testimony when he said—, where Mr. Sivert pointed out the property ran under the hamburger house, that little house there on the property—did you hear Mr. Sivert—did Mr. Sivert make any statement about the line running under there?

A Mr. Sivert told him: 'I don't know'—he was in a jesting mood—he said, 'I wouldn't know where the line is exactly,' he said, 'it could run by the side of the house, it could run under the house, this could be the line we're standing on'—and we were standing right at that corner post at that time."

As stated, the contract provided for the payment of $4,750.00 earnest money which was put up by Mr. Battles. The contract also provided that "upon failure of buyer to comply herewith, seller may at his option enforce specific performance or may forfeit said earnest money as liquidated damages," $2,250.00 thereof to go to seller and remainder to the agent Adams.

**484**

It is the general rule that when one party to a contract commits a material breach of the contract or places himself in a situation that he is unable to perform, the other party is discharged or excused from his obligation to perform. Vendor and Purchaser, 58 Tex.Jur.2d Sec. 155, p. 364. Sec. 137 of the same title and text states that the purchaser of land is entitled to the quantity of property that he contracted to buy.

It is our opinion that Mr. Sivert, by his own act, has made it impossible for him to perform the contract he made with Mr. Battles in that he has by agreeing to a boundary line with his neighbor, Mr. Mc-Dougall, *after* execution of the contract, and to which Mr. Battles did not consent, deprived Mr. Battles of his right under the contract to be conveyed a material amount of water frontage. By such agreement, Mr. Battles was also deprived of the opportunity to negotiate with his neighbor to be regarding the boundary.

We believe that any reasonable construction of the evidence having probative force is that Mr. Battles would lose approximately 27½ feet of water frontage. Accepting the guess of Mr. Sivert that the loss was only 8 or 9 feet, we would still consider the shortage material especially in view of the $1,500.00 value which Mr. Sivert put on it.

It is common knowledge that the value of property adjacent to water is largely determined by the amount of water frontage. Twenty-seven and one half feet would be large enough for a cabin. Eight or nine feet would be large enough for a boat dock.

Believing that performance of the contract on the part of Mr. Battles has been excused by the act of Mr. Sivert, we reverse the judgment of the trial court and render judgment for Mr. Battles for the sum of $4,750.00 and costs of suit.

Reversed and rendered.