Michael A. CORSO, Lawrence M. Carr,
Bill Wilson and the National Bank of
Texas at Fort Worth, Appellants,

v.

Harry CARR, et ux., Laura
Carr, Appellees.

No. 2–81–027–CV.

Court of Appeals of Texas,
Fort Worth.

June 10, 1982.

McLean, Sanders, Price, Head & Ellis, and Albon O. Head, Jr., Kathleen W. Billingsley, Barlow, Gardner, Tucker & Garsek, and James B. Barlow, Gloria I. Rice, James Henley Morgan, Fort Worth, for appellants.

Frank R. Jelinek, Inc. and Frank R. Jelinek, Fort Worth, for appellees.

Before MASSEY, C. J., and JORDAN and SPURLOCK, JJ.

## OPINION

JORDAN, Justice.

This is a suit for breach of a contract against appellant Corso who had contracted with appellees to construct a residence for them. The suit also involves allegations of civil conspiracy against Corso and the other three named appellants on the theory that the individuals and the bank conspired together to sell the residence eventually built by Corso for appellee Harry Carr and wife to appellant Lawrence M. Carr. The two Carrs are not related. Harry, appellee, is the party to the contract to construct the house. Lawrence M., or Larry, Carr was the subsequent purchaser of the house. The parties hereafter will be referred to, for the most part, as Corso, the builder: Harry, or Harry and Laura, the original purchasers of the house; Larry, the subse-

quent purchaser and present owner; Wilson, appellant herein and president of The National Bank of Texas at Fort Worth, which bank will simply be referred to as Bank.

It will be necessary to recite the facts resulting in this lawsuit in considerable detail.

On June 7, 1977, appellees, Harry and Laura Carr, entered into a contract with appellant Corso whereby, for the total consideration of $111,000.00, Corso agreed to build a house primarily designed by appellees, at 411 Rollinghills Trail in Arlington, Texas. It was contemplated and agreed by the parties that any additions to the design or construction of the house would be extra and would be paid for by appellees in addition to the $111,000.00.

The Carrs paid $11,000.00 down on the construction contract and the balance of the purchase price was to be paid at closing. Nothing was said in the contract about the financing of the balance of the purchase price or about the cost of such financing. This fact becomes important later.

Prior to the contract date of June 7, 1977, Harry and Laura, accompanied by the builder, Corso, went to United Financial Mortgage Company, where the Carrs secured a commitment letter for permanent mortgage funds in the amount of $99,900.00. Corso then took the commitment letter, the contract with the Carrs and the deed to the lot, to appellant National Bank of Texas at Fort Worth, where he secured the interim financing to build the house.

This first commitment letter from United Financial Mortgage Company expired in January of 1978, and Harry secured an extension of the mortgage company's commitment to March 26, 1978.

Corso's interim construction loan was due at the Bank on March 14, 1978, and he also knew that Harry's commitment letter expired on March 26, 1978, so he was anxious to close the transaction. Construction was virtually complete by mid-March and a closing date of March 22, 1978 was set at Stewart Title Company in Arlington.

Sometime prior to the closing date for this transaction, Harry had secured a second extension of his commitment letter from United Financial Mortgage Company, extending the commitment date from March 26 to April 6, 1978. He at no time told any of the parties to this lawsuit, Corso, Larry Carr, Bill Wilson, or the Bank of this second extension. In fact, it was not until depositions were taken in preparation for trial of this case that the other parties learned of this extension to April 6, 1978.

On the morning of March 22, 1978, prior to the time set for closing, Corso and Harry met to discuss the closing and some of the details thereof. At that time, Corso told Harry that he would not pay the "discount points" which Harry had told him were being charged on his loan by the mortgage company. These "discount points" are charges made by the mortgage company for the making and servicing of the loan. Harry also refused to pay the "discount points" and as a consequence the "points" were not paid and the loan transaction was not closed by the title company on that day.

Harry said at one time that March 22, 1978 was the first he had ever heard of these "points", but on another occasion, while testifying, did say he though Corso had mentioned the necessity of paying "discount points" earlier, perhaps sometime in January of 1978.

Harry and Laura had prepared a "punch list" of very minor items of things needing done or corrected before the house was complete. When they went to the title company office on March 22, they presented a letter to the title company, to be signed by them and Corso authorizing the withholding of $2000.00 from the balance due Corso, to assure the completion of these minor items, which Harry admitted could be done for around $300.00. The Carrs signed the letter but Corso did not.

We reiterate that the construction contract between Corso and Harry, dated June 7, 1978, did not discuss anything about financing the balance of the purchase price; specifically, the contract did not obligate either party to pay "discount points" or any finance charges. No other subsequent agreement was ever made between these parties regarding such payments.

Later on March 22, 1978, the date set for closing, Corso went to Harry's office and reiterated his position that if Harry refused to pay the points and to close the transaction, he would sell the house to someone else. His note at the Bank was then in default, having been due since March 14, 1978, and, as far as Corso knew, Harry's commitment letter from the mortgage company would expire on March 26, 1978. He did not know of the extension to April 6, 1978.

After Harry refused to pay the points and close the loan in the early afternoon of March 22, there was no further communication between him and Corso. It is disputed as to whether or not Harry and Laura had signed the closing papers at the title company on that date, although Corso and Larry Carr testified at trial that the papers had not been signed.

The plot now thickens, according to appellee's position, because on March 22, 1978, the date set for closing of the contract between Corso and Harry, Corso went to the house at 411 Rollinghills Trail where he saw Larry Carr, one of the appellants herein. Larry's in-laws owned and lived in the house at 409 Rollinghills Trail, right next door to the one built for Harry and Laura. Before this, though Corso had seen Larry around the house at 409 Rollinghills Trail, there had never been any discussion between Corso and Larry about Larry purchasing the house at 411, built for Harry and Laura.

On March 23, 1978 Larry Carr had lunch with Bill Wilson, President of The National Bank of Texas at Fort Worth, and a loan for the purchase of the house built for Harry and Laura was discussed. Larry had been advised by Corso that Harry and Laura had backed out on their contract and refused to close the sale. On this same day, March 23, Wilson submitted Larry's application for a loan to the loan committee of the Bank and it was approved. On March 27, 1978, Corso, his attorney and Larry went to

Stewart Title Company to see if Harry had done anything further about paying the points and closing his loan. They learned that he had not, although this fact is disputed by Harry.

On March 28, 1978, Corso and Larry closed the sale of the house to Larry at US Life Title Insurance Company.

On March 29, 1978, Harry changed his mind, went to Stewart Title Company and tendered a check to the title company for $1,498.00, the amount of the discount points charged by the mortgage company.

Appellees then sued Corso, Larry, Wilson and the Bank, asking for damages, including exemplary damages, against all defendants, for breach of contract by Corso, for civil conspiracy to deprive them of the house built for them, and for tortious interference with the contract with Corso. The trial court, at the close of the evidence, withdrew the tortious interference action from the jury and rendered judgment for appellants on that theory. The court then rendered judgment against all appellants, based on the answers of the jury to special issues.

Judgment was rendered against Corso for the total sum of $26,734.81, representing $4,052.00 damages for loss of appellee's bargain (the difference between the fair market value of the property at the time of breach of contract, March 22, 1978 and the contract price), plus $11,000.00 for the cash down payment, plus pre-judgment interest in the sum of $4,182.81, plus $7,500.00 as reasonable attorney's fees. Judgment was also rendered against Corso and all other appellants, jointly and severally, for $19,-950.00 actual damages for conspiracy, plus the sum of $19,950.00 for exemplary damages (representing a remittitur ordered by the court from a jury finding of $59,850.00 exemplary damages).

This appeal was filed by all defendants below.

At the conclusion of all the evidence in this case, Corso moved for a directed verdict or in the alternative moved the court to withdraw the case from the jury and render judgment for Corso, in part on the theory that as a matter of law there had been no breach of the contract by Corso. The motion was overruled. We hold that the motion should have been granted by the trial court.

This is a simple, standard form contract of sale, whereby Corso agreed to build and convey to Harry Carr a three-story family dwelling at 411 Rollinghills Trail in Arlington, Texas, for an agreed total price of $111,000.00. The contract provided that $11,000.00 would be paid at time of execution of the contract, which it was, with the balance at time of closing. The last paragraph of the contract provided: *"There are no agreements, conditions, stipulations or other representations, verbal or otherwise, other than those contained herein."* (Emphasis ours).

The trial court submitted a special issue inquiring of the jury if in March, 1978 the custom in the real estate trade was that the seller pays discount points on real estate transactions when the contract of sale is silent as to who is to pay such discount points. The jury answered: the seller pays discount points.

The contract is clear with respect to the obligations of both parties: Corso was to build a house for Harry, according to plans and specifications approved by Harry and Laura, his wife, and Harry was to pay Corso the sum of $111,000.00 for the house. Corso did build the house, as agreed, and on March 22, 1978, was ready to deed it to Harry and close the transaction. However, at closing, Harry refused to tender the entire balance of the purchase price due Corso. The total cost was approximately $116,-000.00 because of some extra items Corso included at the request and with the agreement of Harry and Laura, so the amount due by Harry at closing was approximately $116,000.00 less the $11,000.00 down payment. Instead, Harry tendered to the title company, for Corso's benefit, the total sum due less the sum of $1498.00, the amount of "discount points" charged by Harry's lender, United Financial Mortgage Company, as part of the cost of financing this house.

Harry also tried to withhold from payment due Corso the sum of $2000.00 for some minor defects or items needing more work, which he admitted would cost no more than $300.00.

The contract was breached, not by Corso, but by Harry Carr when he attempted to withhold the $1498.00 demanded by his mortgage company as "discount points". His obligation under the contract was to pay the full balance of the purchase price to Corso, and when he failed to do so, he breached the contract, thus excusing performance on the part of Corso. It is fundamental that when one party to a contract repudiates or commits a material breach of that contract, the other party is discharged or excused from his obligation to perform. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685 (Tex.1981); *Glass v. Anderson*, 596 S.W.2d 507 (Tex.1980); *Battles v. Adams*, 415 S.W.2d 479 (Tex.Civ.App.—Austin 1967). In *Battles*, it was held that a prospective purchaser of realty was excused from his obligations under a contract to purchase and was entitled to return of his earnest money when, after execution of the contract, the vendor entered into a boundary agreement with an adjoining landowner which resulted in a decrease of the amount of water frontage of realty from the amount vendor had agreed to convey to purchaser. The court there said: "It is the general rule that when one party to a contract commits a material breach of the contract or places himself in a situation that he is unable to perform, the other party is discharged or excused from his obligation to perform. Vendor and Purchaser, 58 Tex. Jur.2d, Sec. 155, p. 364 . . . ."

*Glass v. Anderson, supra,* involved six earnest money contracts for the sale of real property, and the Supreme Court held that when the purchaser repudiated the contracts after the time for performance arrived, the contractual obligations of the non-defaulting party were ended and the purchaser could not obtain specific performance. The court said that Anderson, the purchaser, by his own action in repudiating the contracts by a letter, breached the contracts, and discharged Glass, the seller, from further obligation under the contracts. The court cited the Restatement, § 311, § 312, and Restatement (Second) of Contracts § 260(2). "A breach by non-performance of the contracts after demand had been made by Glass, coupled with or followed by a repudiation of those contracts by Anderson constituted a material breach of the contracts. See Restatement § 319, comment a, and § 312. Glass was then free to treat the contracts as extinguished and whether he materially changed positions subsequently is immaterial. We therefore hold that the repudiation of the contract after time for performance arrives coupled with a total breach of non-performance terminates the contract without the necessity of any affirmative action of the non-repudiating party and excuses performance of the contractual obligation on his part."

For the reasons stated above, the introduction of custom and usage in this case by parol evidence was highly improper and erroneous. Evidence of custom and usage is not competent to contradict the plain and unambiguous terms of an express contract nor to vary, control, impair, restrict, or enlarge the explicit language of the agreement. *Arnold D. Kamen & Co. v. Young,* 466 S.W.2d 381 (Tex.Civ.App.—Dallas 1971, ref. n. r. e.) In this case the court said: "To establish a custom and usage there must be evidence that the custom was generally known, *or* had been established for a sufficient length of time to become generally known, and that it was known to the parties to the contract *or* that the parties had contracted with reference to it."

We have carefully reviewed all the evidence in this case and find that appellees failed to prove either of these two requirements set forth above. There was no evidence that any custom or usage with respect to a builder or seller paying the buyers "discount points" was generally known for any length of time, or that it was known to the parties to the contract or that they had contracted with respect thereto. Moreover, the only testimony with respect to custom and usage on the matter of "dis-

count points" concerned the time of closing of this transaction (March 22, 1978) and not the time of execution thereof in June of 1977. Obviously, a custom existing almost a year after this contract was executed could have nothing whatever to do with who was to pay "discount points" in March of 1978. According to his own testimony, Harry Carr had never even heard of "discount points" until either March 22, 1978, the day of closing, or shortly before that date, but at any rate certainly did not know of them on June 7, 1977, when the contract was signed.

See also *S. K. Y. Investment Corp. v. H. E. Butt Grocery Co.*, 440 S.W.2d 885 (Tex. Civ.App.—Corpus Christi 1969, no writ), where the contract involved contained a provision to the effect that "no obligation or limitation not stated herein shall be imposed on either party hereto," similar to the provision in the contract here involved, where the court held: "In this situation, noted the Court, (citing another case) we would hold that evidence of customs and usages would not be admissible to add to the obligations of the appellee."

It is also noted that the matter of custom and usage was not properly or sufficiently pled by appellees.

■ We also hold that the introduction of custom and usage in this case, so as to charge the builder with a finance charge made by appellee's lender, when the contract did not speak to this matter, was a clear violation of the parol evidence rule. This contract was, as we have already stated, complete on its face; it simply called for the construction and sale of a house to appellees for a certain price, with the balance of the total price to be paid at closing. The question of financing of the balance due by the purchasers, appellees, or the question who would pay finance charges for the appellee's loan, if any, were matters not contemplated or considered, or even known by either of the parties when the contract was signed on June 7, 1977. The matter of the "discount points" charged by appellee's lender, was something that came up at the last minute. The admission of custom and usage by parol testimony added something to the contract that was not there when it was executed. We think the admission of this parol evidence created a new contract for these parties. See Ray, Texas Practice, Vol. 2 § 1634; *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30 (1958); *Miami Petroleum Company v. Neal*, 333 S.W.2d 876 (Tex.Civ.App.—El Paso 1960, ref. n. r. e.); *Kingsbery v. Phillips Petroleum Company*, 315 S.W.2d 561 (Tex.Civ.App. —Austin 1958, ref. n. r. e.); *Ross v. Stinnett*, 540 S.W.2d 493 (Tex.Civ.App.—Tyler 1976, no writ). In *Kingsbery v. Phillips, supra,* it was said: "In the absence of fraud, accident, or mistake, Parol Evidence is inadmissible to vary, alter, or add to the terms of a written contract, clear in its terms ... *this rule forbids the adding by parol where the writing is silent as well as to vary it where it speaks.*" (Emphasis added).

■ On oral argument of this case the question arose as to whether the judgment entered by the trial court was a final judgment and thus appealable or was merely interlocutory in nature. This issue arose because on October 27, 1981, after the judgment was signed, the trial court granted the defendant Bill Wilson, individually, a new trial. This new trial was timely granted under Rule 329b(c), (e) of the Texas Rules of Civil Procedure, as it was within the 30 day plenary power period of the trial court to grant a new trial or to vacate, modify, or reform the judgment. The judgment was signed August 3, 1981, so the new trial was timely granted under the 1981 amendment to Rule 329b. Accordingly, Wilson was still a party defendant to the original lawsuit and still within the trial court's jurisdiction. Since there was no order of severance, the judgment at least at this time, did not dispose of all parties and therefore, was interlocutory in nature. *Howard Gault & Son, Inc. v. First National Bank of Hereford, Texas*, 523 S.W.2d 496 (Tex.Civ.App.—Amarillo 1975, no writ).

■ However, on motion of appellee, plaintiff below, the trial court, on May 11, 1982, granted appellee a non-suit as to Bill

Wilson, individually. We hold that the non-suit as to appellee Bill Wilson, individually, effectively removed him as a party defendant to this lawsuit, and thus made the judgment rendered on August 3, 1981 as to all other defendants, a final and appealable judgment. This order of non-suit was rendered by the trial court, when it still had jurisdiction of Wilson, because of the granting of the new trial on October 27, 1981 and was rendered before submission of this case to this court on May 20, 1982. Therefore, the judgment as to the remaining parties is final and no longer interlocutory. *See McEwen v. Harrison*, 162 Tex. 125, 345 S.W.2d 706 (1961); *H. B. Zachry Co. v. Thibodeaux*, 364 S.W.2d 192 (Tex.1963); *Runnymede Corporation v. Metroplex Plaza, Inc.*, 543 S.W.2d 4 (Tex.Civ.App.—Dallas 1976, writ ref. n. r. e.). These cases hold that where an interlocutory order is entered disposing of one or more defendants, that order becomes final, and there is a final judgment, when a subsequent order is entered disposing of the remaining defendant or defendants.

For the reasons stated above to the effect that there was no breach of the contract by appellant Corso, and that his performance under this contract of sale was excused by Harry Carr's breach thereof, we render a take nothing judgment against Harry Carr as to appellant Corso.

■ Since the contract of sale stipulated that in the event purchaser is the defaulting party, seller had the right to retain the cash deposit or down payment as liquidated damages for breach of contract, we hold that appellant Corso is entitled to retain the $11,000.00 down payment.

■ Since we have held that Corso did not breach this contract of sale, but that Harry Carr did, there could be no cause of action against the other appellants for civil conspiracy or for exemplary damages and we also render judgment in favor of appellants Larry Carr, Bill Wilson and The National Bank of Texas at Fort Worth, and order that as to these appellants also Harry Carr take nothing.