

# IN THE
# TENTH COURT OF APPEALS

## No. 10-15-00354-CV

**ERIC RANDLE,**

**Appellant**

**v.**

**CLINT SANDERS,**

**Appellee**

### From the County Court at Law No. 2
### McLennan County, Texas
### Trial Court No. 2015-0182-CV2

## MEMORANDUM OPINION

This case involves the validity of a "handshake" agreement made the "cowboy way" between two experienced team ropers.[1] In two issues, appellant, Eric Randle, argues that: (1) there is no evidence to support the jury's finding that he entered into a

---

[1] As fictional cowboy hero Hopalong Cassidy suggests, agreements made the "cowboy way" are held to a higher standard. *See* Hopalong Cassidy's Creed for American Boys and Girls, http://www.hopalong.com/creed.htm (last visited Oct. 13, 2016) (stating that, in relevant part: "The highest badge of honor a person can wear is honesty. Be truthful at all times"; "If you want to be respected, you must respect others. Show good manners in every way"; and "Only through hard work and study can you succeed. Don't be lazy.").

contract with appellee, Clint Sanders; and (2) because the jury found that the parties entered into a contract, Sanders is precluded as a matter of law from recovering under quantum meruit. As shown below, we conclude that a contract did not exist between the parties; however, Sanders is entitled to recover on his quantum-meruit theory of recovery. And because the trial court's judgment generally awards damages and does not specifically state that the damage award corresponds with a particular theory of recovery, we affirm.

## I. BACKGROUND

Both Randle and Sanders participated in the 2014 World Series of Team Roping Finale held in Las Vegas, Nevada. The day before the short round of competition, Randle's horse "came up lame," leaving Randle without a horse for the remainder of the competition. According to Sanders, Randle asked "if he could use the black horse. His mare was crippled. His horse was crippled." Sanders responded, "Yeah, yeah, I think so." At the time of the request, Randle was "fixing to rope" within the hour.

At trial, Sanders described the agreement between him and Randle as follows: "Yes, Mr. Randle. 'Is it okay if I ride Tex?'" Sanders responded, "'Yeah, if you need him, let's put the boots on him.' So that's how it went." Sanders further noted that Randle did not mention nor attempt to negotiate the "mount money."

Randle's recollection of the conversation differed. Specifically, Randle noted that the "agreement" entailed the following: "I just asked him if he minded if I used his horse

and he said, no, he didn't mind, and he came down and helped me put boots on him, and gave him some Ace, and that was it. There was no discussion of anything other than, 'You bet you can use him.'"

Despite having options to ride other people's horses, Randle decided to ride Tex for the remainder of the competition. On cross-examination, Sanders admitted that he did not discuss "mount money" with Randle prior to Randle riding Tex. Randle noted that he had "no agreement at all" with Sanders with regard to using Tex and that the parties "didn't have any contract." In any event, Sanders testified that he assumed that Randle "knew that mount money was supposed to be paid when horses were borrowed" and that the industry custom for "mount money" is 25% of any winnings, though this custom was merely a "cowboy rule" that is not written down anywhere. In addition, one of Sanders's witnesses, Colton Nelson, stated that the amount of "mount money" is "[n]ormally 20 to 25 percent, I guess . . . ."

Ultimately, Randle won the 2014 World Series of Team Roping Finale while riding Tex. The prize for winning was $304,000. Randle's cut of the winnings was $152,000. Exhibits admitted at trial showed that Randle's team won an additional $12,000 in other rounds while Randle rode Tex. These additional winnings increased Randle's cut to $158,000.

Upon returning home, Sanders contacted Randle about the "mount money" that he believed Randle owed him.[2]  According to Sanders, "mount money" is owed "normally as soon as possible."  After a conversation, Randle agreed to "get together" with Sanders at the New Year's Open roping competition in Salado "to get this deal kind of squared away."  When Randle did not attend the New Year's Open roping competition, Sanders sent Randle an invoice for 25% of the winnings from the Finale.  Thereafter, Randle sent Sanders a check for $10,001 to serve as "a very nice gesture to show [his] appreciation" for Sanders letting him use Tex for the competition.

Sanders refused Randle's $10,001 check and filed suit, arguing that the parties' agreement and custom dictated that Randle pay 25% of his winnings in exchange for borrowing the horse.  Sanders asserted that he was entitled to compensation under breach-of-contract and quantum-meruit theories.  The case was subsequently tried to a jury.

---

[2] Sanders testified that he and Randle spoke in the truck before this competition about "mount money."  Specifically, Sanders recounted the following:

Eric was telling us a story that he had a friend who had placed in—just placed in the 12 roping, which I believe was going on that day.  And his horse—his friend's horse had gotten crippled, and he just needed a horse to ride in the short round for one steer.

And he ended up winning some money in the roping and the owner of the horse wanted 25 percent just for riding that one—on that one steer, that short round.  And we all kind of talked about it and . . . .

Yeah.  I mean, we kind of had a discussion about, well, you know, maybe on one steer it might have—it might have, should have been a quarter of a quarter or something, but, you know, usually on all four steers it's the 25 percent.

At the conclusion of the evidence, the jury determined that the parties had entered into a contract and that Randle had breached the contract. The jury also concluded that Sanders was entitled to recovery under his quantum-meruit theory and awarded Sanders $39,501 for the reasonable value of compensable services at the time and place they were provided. Thereafter, the trial court adopted the jury's findings and signed a final judgment awarding Sanders $39,501 in actual damages. Randle filed motions for new trial and for judgment notwithstanding the verdict. Both motions were overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

## II.    WHETHER A CONTRACT EXISTED BETWEEN THE PARTIES

In his first issue, Randle contends that the evidence is legally and factually insufficient to support the jury's finding that the parties entered into a contract. We agree.

### A. Standard of Review

In reviewing for legal sufficiency of the evidence, we consider the evidence in the light most favorable to the factfinder's finding. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008). The test for legal sufficiency "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [fact-finder] to reach the [conclusion] under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* The fact-finder is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *Id.* at 819.

In a factual sufficiency review, we must consider and weigh all of the evidence in a neutral light. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The evidence is factually insufficient only if we conclude "that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of probative force in support of the verdict." *Id.*

## B. Applicable Law

The elements for a valid and binding contract are: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App.—Fort Worth 2004, pet. denied); *Labor Ready Cent. L.P. v. Gonzalez*, 64 S.W.3d 519, 522 (Tex. App.—Corpus Christi 2001, no pet.). Consideration is also a fundamental element of every valid contract. *Turner-Bass Assocs. of Tyler v. Williamson*, 932 S.W.2d 219, 222 (Tex. App.—Tyler 1996, no writ). The elements of written and oral contracts are the same and must be present for a contract to be binding. *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied); *Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279, 284 (Tex. App.—El Paso 1991), *aff'd in part, rev'd in part on other grounds*, 847 S.W.2d 218 (Tex. 1992). Where an essential term is open for future negotiation, there is no binding contract. *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 653 (Tex. App.—Houston [14th Dist.] 2003, pet.

denied); *Gerdes v. Mustang Exploration Co.*, 666 S.W.2d 640, 644 (Tex. App.—Corpus Christi 1984, no writ). In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999, pet. denied)). The terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended. *Copeland*, 3 S.W.3d at 605. The proponent may prove the contract by either circumstantial or direct evidence. *Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex. App.—San Antonio 2000, pet. denied).

## C. Discussion

Here, we cannot say that the evidence is sufficient to support the jury's finding that the parties entered into a valid oral contract for "mount money" in exchange for riding Tex. As mentioned earlier, the parties' discussion of the agreement simply entailed Randle's request to ride Tex during the roping Finale and Sanders's acquiescence. More specifically, the testimony showed that Randle asked, "Is it okay if I ride Tex?," to which Sanders responded, "Yeah, if you need him, let's put the boots on him." The term corresponding with "mount money" allegedly to be paid by Randle to Sanders was not discussed when the agreement was made. Furthermore, Sanders believes that Randle should pay 25% of his winnings at the roping Finale as "mount money," whereas Randle

argues that the parties had "no agreement at all." We conclude that the oral agreement was lacking an essential term and the record reveals that there was no meeting of the minds with respect to the payment or compensation term. *See Hubbard*, 138 S.W.3d at 481; *Schleider*, 124 S.W.3d at 653; *Gonzalez*, 64 S.W.3d at 522; *Gerdes*, 666 S.W.2d at 644; *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook."). In other words, we cannot say that the payment or compensation term was expressed with sufficient certainty so that there was no doubt as to what the parties intended. *See Copeland*, 3 S.W.3d at 605.

Nevertheless, despite the lack of discussion about the payment or compensation term, Sanders argues that industry custom sufficiently established that the agreement required Randle to pay Sanders 25% of his winnings as "mount money." "A custom is a practice so general and universal that the parties to a contract are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it." *Energen Res. MAQ, Inc. v. Dalbosco*, 23 S.W.3d 551, 556 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (citing *Barreda v. Milmo Nat'l Bank*, 252 S.W. 1038, 1039-40 (Tex. 1923) (stating that the general rule regarding custom and usage, in a case of contract, is that the custom and usage must be so general that both parties are presumed to be aware of the custom or usage, or that the parties have actual knowledge of the custom or usage, and the parties are charged with having contracted with reference to

the usage or custom); *State Nat'l Bank of Houston v. Woodfin*, 146 S.W.2d 284, 286 (Tex. Civ. App.—Galveston 1940, writ ref'd)). As the *Woodfin* Court noted:

> It has been uniformly held in this State that a custom, in order to constitute an element of contract, must be either shown to have been known personally to the parties to the contract, or to have been so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it.

*Woodfin*, 146 S.W.2d at 286. "[W]e may consider extrinsic evidence, such as expert testimony or reference material, to determine whether a contract term enjoys a commonly understood meaning in the industry." *Va. Power Energy Mktg. v. Apache Corp.*, 297 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

However, "custom or usage of trade cannot vary, control, impair, restrict[,] or enlarge the express language of the contract." *Tex. Gas Exploration Corp. v. Broughton Offshore Ltd. II*, 790 S.W.2d 781, 786 (Tex. App.—Houston [14th Dist.] 1990, no pet.) (citing *Miller v. Gray*, 136 Tex. 196, 149 S.W.2d 582, 583 (1941); *Corso v. Carr*, 634 S.W.2d 804, 808 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.)). Moreover, "'[u]sage or custom cannot create or bring a contract into being where without it no contract exists.'" *Oxford v. Rogers*, 238 S.W. 295, 298 (1921) (quoting 2 ELLIOTT ON CONTRACTS, § 1709)). "'In other words, usage or custom cannot make a contract when the parties themselves have made none.'" *Id.* (quoting 2 ELLIOTT ON CONTRACTS, § 1709). "[A] custom or course of dealings is admissible to prove or interpret some of the terms of the contract independently made but . . . no Texas case establishes that a contract can be based solely on a prior course of

dealings." *Galaxy Boat Mfg. Co. v. East End State Bank*, 641 S.W.2d 584, 587 (Tex. App.—Houston [14th Dist.] 1982, no writ) (citing RESTATEMENT (SECOND) OF CONTRACTS § 249 (1972); 13 TEX. JUR. 2D 305; 25 C.J.S. 142, 143; *Oxford*, 238 S.W. at 298).

Here, Sanders testified that a custom existed whereby a person borrowing a horse to compete in a team roping event would pay the horse lender 25% of any winnings earned while riding the horse as "mount money." Randle disputed the existence of this custom in the amateur team-roping industry, though Randle apparently told Sanders about a horse owner who requested that Randle's friend pay 25% of his winnings in "mount money" when the friend borrowed a horse for a roping competition.

In any event, given that we have already concluded that a contract between Randle and Sanders did not exist because there was not a meeting of the minds with respect to the payment or compensation term, the foregoing case law dictates that we "'cannot use custom to bring a contract into being where without it no contract exists.'" *Oxford*, 238 S.W. at 298 (quoting 2 ELLIOTT ON CONTRACTS, § 1709); *see Miller*, 149 S.W.2d at 583; *Tex. Gas Exploration Corp.*, 790 S.W.2d at 786; *Galaxy Boat Mfg. Co.*, 641 S.W.2d at 587; *Corso*, 634 S.W.2d at 808. And even if we were to apply industry custom to satisfy the payment or compensation term, we note that Sanders's evidence does not establish that it is a general and universal industry custom that 25% is the proper amount of "mount money" owed in such circumstances. *See Woodfin*, 146 S.W.2d at 286. Accordingly, we reject Sanders's contention that the purported contract can be saved by industry custom with

regard to "mount money." We therefore sustain Randle's first issue. However, this does not end our inquiry.

## III. QUANTUM MERUIT

In his second issue, Randle asserts that Sanders is precluded from recovering under quantum meruit as a matter of law because the jury concluded that the parties had entered into a contract.

Quantum meruit is an equitable theory of recovery intended to prevent unjust enrichment when there is an implied agreement to pay for goods or services provided. *In re Kellogg Brown & Root*, 166 S.W.3d 732, 740 (Tex. 2005); *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990); *see Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985) (noting that quantum meruit is founded on the principle of unjust enrichment). "Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished." *Vortt Exploration Co.*, 787 S.W.2d at 944. In other words, a party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished. *See Murray v. Crest Construction, Inc.*, 900 S.W.2d 342, 345 (Tex. 1995); *see also R.M. Dudley Construction Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App.—Waco 2008, pet. denied).

> Unjust enrichment, itself, is not an independent cause of action but rather "characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *Friberg-Cooper Water*

*Supply Corp. v. Elledge*, 197 S.W.3d 826, 832 (Tex. App.—Fort Worth 2006, pet. filed) (quoting *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.)), [*rev'd on other grounds*, 240 S.W.3d 869 (Tex. 2007)]; *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied); *see Best Buy Co. v. Barrera*, 214 S.W.3d 66, 73 (Tex. App.—Corpus Christi 2006, pet. filed), [*rev'd on other grounds*, 248 S.W.3d 160 (Tex. 2007)]. The doctrine applies the principles of restitution to disputes where there is no actual contract, based on the equitable principle that one who receives benefits that would be unjust for him to retain ought to make restitution. *Friberg-Cooper*, 197 S.W.3d at 832; *Mowbray*, 76 S.W.3d at 679. Unjust enrichment is not a proper remedy "merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels Bros. Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992) (quoting *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied)); *Mowbray*, 76 S.W.3d at 679. To recover under an unjust enrichment theory, the benefits to the other party must be actually unjust under the principles of equity. *Mowbray*, 76 S.W.3d at 679; *Burlington N. R.R. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex. 1998).

*Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 246-47 (Tex. App.—Fort Worth 2007, no pet.).

Earlier, we concluded that the jury's determination that the parties had entered into a contract is not supported by sufficient evidence. In effect, we have concluded that the evidence in the record does not demonstrate that the parties' agreement constituted a valid contract. That, however, does not preclude Sanders from being compensated under his quantum-meruit theory.[3] *See In re Kellogg Brown & Root*, 166 S.W.3d at 740; *Vortt Exploration Co.*, 787 S.W.2d at 944.

---

[3] We also note the following:

At trial, Sanders noted that "as a rule in our industry, if you go borrow a horse, it's 25 percent mount money." Sanders also recalled a conversation he had with Randle whereby Randle mentioned a friend who borrowed a horse and was asked to pay 25% of his winnings as "mount money." Colton Nelson, a team roper, testified that there are "unwritten rules" with respect to "mount money" and that the custom is "[n]ormally 20 to 25%" of the winnings on a borrowed horse. Nelson also stated that his friend from South Carolina told him "25 percent" was a common rate for "mount money." Another team roper, Buddy Reed, testified that the "rule of the game when it comes to the business of mount money" is 25% of the winnings. Reed further noted that a cowboy requesting to borrow a horse can negotiate something different than 25% of his winnings, but that agreement must be made before using the horse.

Other roping witnesses, including Greg Miller, Roy Payne and Casey Roberts, noted that they had never heard of a rule on "mount money." Payne, in particular,

---

> After the jury has returned its verdict, if the prevailing party obtains a favorable verdict on inconsistent theories of relief, the prevailing party is entitled to elect under which theory it wants to recover in the judgment. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006). If a judgment is reversed on appeal, the losing party can seek to recover instead on an alternative theory upon which the party prevailed at trial. *Boyce v. Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988); *Jerry L. Starkey, TBDL, L.P. v. Graves*, 448 S.W.3d 88, 97 (Tex. App.—Houston [14th Dist.] 2014, no pet. To be entitled to change the basis for its recovery, however, the party must have *prevailed* on that theory. *See Boyce Iron Works*, 747 S.W.2d at 787; *Starkey*, 448 S.W.3d at 97.

*Holmes v. Jetall Cos., Inc.*, No. 01-15-00326-CV, 2016 Tex. App. LEXIS 7213, at *20 (Tex. App.—Houston [1st Dist.] July 7, 2016, pet. filed) (mem. op. on reh'g) (emphasis in original). As stated earlier, the jury found in favor of Sanders on both his breach-of-contract and quantum-meruit theories of recovery.

opined that it is the "cowboy way to just help each other out" and that he was happy when a borrower of his horse took him to dinner with the winnings. And finally, Denny Gentry, the owner of the World Series of Team Roping and the founder of the "Bible for the industry," "Super Duper Magazine," testified that in recreational team roping, no "mount money" is required if you win while riding a borrowed horse. Gentry also stated that "mount money" is a "non-associational issue," meaning that the issue is not addressed in any rules promulgated by the United States Team Roping Championships.

In light of this testimony, there is conflicting evidence regarding the amount of "mount money" owed, if any, after using a borrowed horse. The jury, as the trier of fact, bore the burden of resolving the conflicts in this evidence and judging the credibility of witnesses.[4] *See City of Keller*, 168 S.W.3d at 819-20; *see also Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 758 (Tex. App.—Dallas 2008, no pet.). Consequently, we must assume that, where reasonable, the finder of fact resolved all conflicts in the evidence in a manner consistent with the findings. *See City of Keller*, 168 S.W.3d at 820; *see also Capps v. Gibbs*, No. 10-12-00294-CV, 2013 Tex. App. LEXIS 4931, at *8 (Tex. App.—Waco Apr. 18, 2013, pet. denied) (mem. op.).

The record reveals that Randle rode Tex for multiple rounds at the roping competition in Las Vegas over a four-day period and that Randle's team won a total of

---

[4] In the January 2015 Special Feature of Rodeo News, which reported on the World Series of Team Roping, Randle stated the following about when he was informed about the 25% "mount money" standard: "Guess I should be thankful he didn't demand 50%."

$316,000.  Randle's cut of the winnings was $158,000.  The jury determined that the reasonable value of compensable services provided by Sanders to Randle was $39,501, which is approximately 25% of $158,000.  Based on our review of the record, we cannot say that the jury was unreasonable in concluding that Sanders is entitled to compensation in the amount of 25% of Randle's $158,000 cut of the winnings from the Team Roping Finale under Sanders's quantum-meruit theory of recovery.  Accordingly, we hold that the jury's $39,501 damages award in favor of Sanders is supported by sufficient evidence in the record.  *See Reyes*, 272 S.W.3d at 592; *City of Keller*, 168 S.W.3d at 819-20; *Jackson*, 116 S.W.3d at 761; *see also Vortt Exploration Co.*, 787 S.W.2d at 944; *Wolf*, 234 S.W.3d at 246-47. We overrule Randle's second issue.

## IV.    CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.[5]

---

[5] The trial court's judgment states, in relevant part:

> At the close of evidence, the jury was charged by the Court and upon close of final arguments, took the case under deliberation.  On July 15, 2015, the jury delivered its verdict in favor of Plaintiff Clint Sanders.

> IT IS THEREFORE ORDERED, ADJUDGED AND FINALLY DECREED that Plaintiff CLINT SANDERS have and recover from Defendant ERIC RANDLE judgment in the sum of Thirty-Nine Thousand Five-Hundred and One and no/100 U.S. Dollars ($39,501.00). Post-judgment interest on the amount remaining unpaid shall accrue at the rate of 5% per annum.

The judgment generally awards damages and does not state that the damage award specifically corresponds with either the contract theory or the quantum-meruit theory of recovery.

AL SCOGGINS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
(Chief Justice Gray concurring)*
Affirmed
Opinion delivered and filed December 14, 2016
[CV06]

*(Chief Justice Gray generally concurs in the court's judgment.  A separate opinion will not issue.  He notes, however, that he would affirm on the breach of contract theory.  The element of the amount of compensation was provided by evidence of custom and usage.  This evidence was not uncontroverted, but the jury clearly believed Sanders's witnesses.  It is not my job to second-guess those witnesses or the jury's determination of which witnesses was to be believed.  The jury was not asked to determine breach of contract damages because it could be readily computed.  The amount of winnings by Randle while riding Tex was undisputed.  The question answered affirmatively by the jury specified a 25% rate for mount money.  That calculates to be $39,500.  The jury determined the quantum meruit damages as $39,501.  I suspect the $1 difference was the result of Randle tendering to Sanders a check for $10,001.  With these comments, I concur in the court's judgment.)

