**TEXAS GAS EXPLORATION CORPORATION, Appellant,**

v.

**BROUGHTON OFFSHORE LIMITED II, Appellee.**

No. C14–89–00522–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 10, 1990.

Rehearing Denied June 7, 1990.

William E. Junell, Jr., Kay T. Hazelwood, Houston, for appellant.

Michael P. Graham, Kathryn S. Page, Houston, for appellee.

Before PAUL PRESSLER, CANNON and ELLIS, JJ.

OPINION

ELLIS, Justice.

Texas Gas Exploration Corporation [Texas Gas] appeals from a judgment rendered in favor of Broughton Offshore Limited II [Broughton] in a breach of contract suit. In twenty-five points of error, Texas Gas primarily challenges the jury's and the trial court's interpretation of the drilling contract. It challenges the sufficiency of the evidence to support the damages awarded to Broughton. It also asserts that the trial court erred by refusing to submit issues on

waiver and estoppel, and by allowing an improper amount of prejudgment interest. We affirm the judgment of the trial court.

In 1981, daily rental rates for jack-up offshore drilling rigs, such as those owned by Broughton, were high and rapidly escalating. To protect itself from those rapidly escalating rates, Texas Gas signed a long term drilling contract with Broughton that provided for an initial term beginning on March 10, 1981. Paragraph 2(a) of the contract provided as follows:

> 2.(a) *Commencement Date and Term.* ... Subject to provisions of Article 2(b)[1] below, this Agreement shall remain in effect for two years following such Commencement date *and shall continue thereafter for the time required to complete operations on any well then drilling* and demobilize the Rig to Galveston, Texas, or other mutually agreeable location as provided by Schedule A(2).

[Emphasis added].

By late 1982 and early 1983, when the initial term of the contract was about to expire, the oil industry had suffered a significant downturn and daily rates for rigs like the Broughton II were much lower. Texas Gas made it clear to Broughton, it wanted "relief from the contract". Due to its own financial commitments, Broughton was not able to suspend the contract or to simply lower the contractual rate for the remaining term, as Texas Gas requested. Broughton did offer to negotiate a lower rate in exchange for an extended contract term, but Texas Gas was not interested. Broughton was informed that drilling was to begin on a final well in late 1982, or early 1983.

The contract had been negotiated by Carlos Broughton and C.J. Burleson, vice president of drilling and production for Texas Gas. Burleson was replaced by Brock Moore in late 1982. In December, Mr. Broughton met with Moore for a "get acquainted" lunch. Moore again asked Broughton to consider renegotiating a lower day rate as of March 10, and to let him know in mid-February. Mr. Broughton believed that if operation on this last well was still underway the contract would remain in effect. Mr. Broughton testified that, since he had just met Moore and Moore had not been involved in the original contract negotiations, he did not think it appropriate to get into a discussion of contract interpretation. Rather, he agreed to do as Moore suggested; he would take the proposal under advisement and they would talk further in February.

At that February meeting, Moore told Mr. Broughton that he did not agree with Broughton's interpretation of the contract. Texas Gas took the position that the contract expired on March 10, and that only if Texas Gas elected to have Broughton complete the required drilling on the well would the contract continue. Moore told Mr. Broughton that if Broughton would not work for a lower than contract rate, Texas Gas would replace Broughton with another drilling contractor. The issue was not resolved that day, since both parties thought the well would likely be completed before March 10.

When Texas Gas had Broughton begin drilling the last well, it hoped to have the well completed before March 10, 1983, the expiration date for the initial term of the contract. However, one of Texas Gas' other contractors improperly mixed some cement, which caused the cement to set prematurely and block the well. Before Broughton could continue drilling the well to a lower depth, it had to drill to remove the cement and pipe stuck in the well; thus, completion was delayed.

Broughton received a letter from Moore on March 8, 1983, in which Moore wrote: "[t]his is to advise that [Texas Gas] will allow the Broughton II Drilling Contract to terminate upon completion of operations on the well currently drilling in accordance with Section 2(a) of the Drilling Contract. We will advise you as soon as possible the

---

1. 2(b) *Extension of Term.* Operator, at its election, may extend the term of the initial contract for an *additional* term of one (1) year provided that the term, rates and conditions applicable during such extension have been mutually agreed in writing at least six (6) months prior to expiration of the term or extension thereof.

estimated completion date of current operations." Since, Moore had not simply said Texas Gas was going to allow the contract to expire by its terms on March 10, 1983, Broughton believed Moore now shared his understanding that the contract would continue until this last well was completed.

However, on March 9, Texas Gas ordered Broughton to place a temporary cap on the well, shut down the rig and move off the property. When Mr. Broughton suggested that he was entitled to complete operations on the well at the contract rate, Moore replied that Broughton would not be permitted to bid to complete the well if it pressed its contractual rights.

Broughton complied with Texas Gas' demand and moved the rig back to shore. Texas Gas contracted with a different rig at a lower daily rate. That rig moved onto the drilling site within two weeks; it finished drilling out the blockage in the well and continued drilling to a depth of approximately 16,500 feet, as Texas Gas' originally planned. Operations continued on the well until May 11, when the well was permanently plugged and abandoned as a dry hole.

■ In points of error one, two, three and four, Texas Gas complains that the trial court erred by granting Broughton's motion for a partially instructed verdict that, because of the undisputed facts and the clear and unambiguous contract language, Texas Gas had breached paragraph 2(a) of the contract. Additionally, Texas Gas' tenth point of error asserts that the trial court erred by failing to grant its motion for judgment non obstante veridicto, because as a matter of law Texas Gas had not breached paragraph 2(a).

■ The language of paragraph 2(a) is worded such that it can be given a certain or definite legal meaning or interpretation. Accordingly, it is not ambiguous and the trial court properly construed the contract as a matter of law. *Coker v. Coker* 650 S.W.2d 391, 393 (Tex.1983).

If the parties had intended that Texas Gas, once it had decided to complete the well in operation on March 10, 1983, would have the unilateral option to determine whether Broughton, or some alternate contractor, would complete the drilling, they could have expressed that intent by the contract language. They did not do so. In contrast, paragraph 2(b) expressly gives Texas Gas the unilateral option to extend the contract for an additional year. Unlike that language, 2(a) does not say the contract *may* continue at the operator's option, the agreed language was that the contract *shall* continue thereafter for the time required to complete operations of any well then drilling.

The trial court correctly stated that to accept Texas Gas' interpretation of the contract would be to render the mandatory language of paragraph 2(a) meaningless, which the law does not permit. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). Contrary to the assertions of Texas Gas, the trial court's interpretation does not conflict with the parties' clear intent that Texas Gas, as the drilling operator, maintain control over operations. The trial court's interpretation of paragraph 2(a) does not give a drilling contractor the right to compel an operator to complete a well. What it does do is to give effect to the clear meaning of the contract language that, if Texas Gas chose to continue operations on the well, it must allow Broughton to continue the work.

■ Texas Gas argues that it was entitled to an instruction on custom and usage of trade. However the record reveals that the requested instruction was properly denied. Custom and usage of trade are not relevant where the contract language is, like the language before this court, clear and unambiguous. *Miller v. Gray,* 136 Tex. 196, 149 S.W.2d 582, 583 (1941). Additionally, to establish custom and usage of trade there must be evidence that the custom was generally known, or had been established for a sufficient length of time to become generally known, and that it was known to all parties to the contract or that the parties had contracted with reference to it. *Arnold D. Kamen & Co. v. Young,* 466 S.W.2d 381, 386 (Tex.Civ.App.—Dallas

1971, writ ref'd n.r.e.). Texas Gas did not present evidence to justify submission of the requested issue. Its own expert testified on direct examination that it was not customary for an operator to change rigs during the drilling of a well, and that it had not occurred in his experience.

■ Even if the contract language were construed to be ambiguous and Texas Gas had presented evidence to justify the instruction, the requested instruction was not an accurate statement of the law. The instruction did not inform the jury that custom or usage of trade cannot vary, control, impair, restrict or enlarge the express language of the contract. *Miller*, 149 S.W.2d at 583; *Corso v. Carr*, 634 S.W.2d 804, 808 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). The requested instruction was properly denied by the trial court.

The evidence established that, despite the delay caused by the faulty cement, Texas Gas never intended to discontinue drilling; it just wanted to complete the well at a lower daily rate. This court understands that it was more economically advantageous for Texas Gas to complete the well at the lower rig rental rates available in 1983. However, when Texas Gas entered into a long-term contract to protect itself from rapidly escalating rates, it concomitantly accepted the risk that it would be bound by the contract if those rates instead declined.

The record is replete with evidence that Texas Gas always planned to complete the well, even when it ordered Broughton to temporarily cap the well and move its rig. The Weekly Progress Reports Texas Gas filed with the Louisiana Department of Conservation are among the clearest items of evidence. For the week in which the Broughton rig was demobilizing, the report described well activity as simply "Operations Suspended"; the following week's report showed activity as "Awaiting Rig"; and the week of March 25 showed that an alternate rig had already begun drilling to eliminate the cement blockage. The testimony of Moore, vice president of Texas Gas, established that Texas Gas intended to complete the well; the only question was whether it could force Broughton to work at a lower than contract rate, or whether it would simply replace the Broughton rig with a cheaper one. The record presents no factual issue as to Texas Gas' intent to complete the well in question. Having made the decision that operations on the well would continue beyond March 10, Texas Gas was bound by the contract to allow Broughton to complete the work. By ordering Broughton to demobilize and then completing the well with an alternate contractor, Texas Gas breached its obligations under the contract.

The language of paragraph 2(a) is clear and unambiguous; the trial court properly interpreted it as a matter of law. Points of error one, two, three, four and ten are overruled.

■ Texas Gas contends the trial court erred in rendering judgment for Broughton, because the evidence conclusively established that Broughton is precluded from claiming breach of contract under the doctrines of estoppel and waiver. Texas Gas also asserts that the trial court erred by refusing to submit its requested special issues concerning estoppel and waiver.

■ This court has defined the elements that must be established to prove estoppel: (1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive of those facts, (3) to a party without knowledge, or means of knowledge, of such facts, (4) with the intention that it should be acted on, and (5) reliance by the party to whom the misrepresentation was made, to that party's detriment. *Echols v. Bloom*, 485 S.W.2d 798, 802 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.) (citing *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929 (1952)). Estoppel may be invoked against a party when it has failed to do that which it had a duty to do. *Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex.1987). Waiver results when the evidence proves there has been an intentional relinquishment of a known right. *United States Fidelity & Guaranty v. Bimco Iron*, 464 S.W.2d 353, 357 (Tex.1971).

Texas Gas contends that the same evidence conclusively proved both affirmative defenses. Texas Gas claims that Broughton is estopped from asserting breach of contract because, it alleges, Broughton "refrained from conveying its contractual interpretation until after Texas Gas requested it remove the rig[; t]he defense of estoppel arises as a result of Texas Gas' reliance on its mistaken belief that the parties were in agreement with respect to contract expiration." Texas Gas also maintains that Broughton waived any breach by failing to object to its order to demobilize the rig. The record does not support these contentions.

There is no evidence to support Texas Gas' contention that Mr. Broughton violated an obligation to state his interpretation of the contract at his first meeting with Mr. Moore. Moore testified that at the December meeting he had suggested Broughton work at below contract rate after March 10. When asked what Mr. Broughton had replied, Moore responded "[h]e didn't say anything. I had asked him just to take that under his advice [sic], if you will, and get back with me at least a month before the expiration of the contract, which would've been around February 10th." Texas Gas' own witness concedes that Mr. Broughton's behavior merely complied with its request.

What the record reflects is that at the February meeting Mr. Broughton, as requested, conveyed his response to Moore's suggestion, and clearly articulated his understanding of paragraph 2(a). On cross-examination Moore admitted that at that meeting he had told Mr. Broughton that he believed the contract expired automatically on March 10, and that Mr. Broughton had stated that he understood the contract language to mean it would terminate only when operations on the well ended. There is not even a scintilla of evidence in the record to support Texas Gas' contention that Mr. Broughton's conduct encouraged "[its] decision to request Broughton to remove its rig on the assumption that its request was not a breach of contract and would be honored."

Nor is there any evidence to support Texas Gas' argument that Broughton did not object to the request to demobilize the rig, and that "[b]y failing to object, Broughton waived its right to claim breach." It is undisputed that when Mr. Broughton was given the order to demobilize he contacted Moore; that he told Moore he had consulted with Broughton's lawyers and suggested they let their respective lawyers work out an amicable solution; that when Mr. Broughton would not agree to work for less than the contract rate, Moore insisted the rig demobilize; that Mr. Broughton refused to agree not to pursue Broughton's rights under the contract in exchange for an opportunity to bid on the continuing operations.

Texas Gas failed to produce any evidence that would furnish a reasonable basis upon which reasonable minds could reach differing conclusions as to the existence of essential elements of its affirmative defenses. Accordingly, the trial court correctly denied its motion for instructed verdict and properly refused to submit special issues on estoppel and waiver. Points of error six through nine are overruled.

■■■■ Although the trial court correctly instructed a verdict on the issue of whether Texas Gas breached, the amount of damages suffered by Broughton because of the breach was determined by the jury. The court gave the following instruction to the jury:

> You are instructed that as a matter of law the defendant, Texas Gas, has breached paragraph 2(a) of the contract identified as Plaintiff's Exhibit No. 1.

In point of error number five, Texas Gas contends this instruction amounted to an impermissible comment on the weight of the evidence. A party objecting to a portion of the charge must point out distinctly the objectionable matter and the ground of the objection. Tex.R.Civ.P. 274. Texas Gas did not raise this objection to the instruction before the trial court. Therefore, it has preserved nothing for appellate review.

Even if Texas Gas had properly preserved its argument, this court would find no error in the instruction. To constitute a direct comment on the weight of the evidence, the instruction must suggest to the jury the trial judge's opinion concerning the matter about which the jury is asked. *Southmark Management Corp. v. Vick,* 692 S.W.2d 157, 160 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). The instruction preceded Question No. 1, which read as follows:

> Find from a preponderance of the evidence what sum of money, if any, would fairly and reasonably compensate Broughton for its damages, if any, that resulted from Texas Gas' breach of the contract with respect to term.
> Answer in dollars ·and cents, if any.
> ANSWER: $_____
> You are instructed that the proper measure of Broughton's damages, if any, is the amount which Broughton would have received had the contract been fully performed by Texas Gas, less any costs saved by Broughton as a result of Broughton not completing operations on the well in question.

Nothing in the instruction suggested what answer the jury should give to Question No. 1. In fact, the question and accompanying instructions permitted the jury to find that Broughton was not entitled to any sum, if they believed the evidence so required. It was clearly helpful to the jury to understand why it was being asked to determine damages; it could not determine what damages would reasonably compensate Broughton without knowing from what event those damages arose. Further, in light of the record as a whole, the instruction did not amount to such a denial of the rights of Texas Gas as was reasonably calculated and probably did cause the rendition of an improper judgment; so any error involved would be harmless. *Island Recreational Development v. Republic of Texas Savings,* 710 S.W.2d 551, 555 (Tex. 1986); Tex.R.App.P. 81(b)(1). Point of error number five is overruled.

By points of error eleven, twelve and thirteen, Texas Gas challenges the sufficiency of the evidence to support the jury's answer to Question No. 1 concerning damages. When both legal and factual sufficiency points are raised, we must first examine the legal sufficiency of the evidence. In reviewing the record, we are to consider only the evidence and inferences that tend to support the jury's finding, and disregard evidence and inferences to the contrary. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985). If there is any evidence of probative value to support the finding, we must uphold the jury's finding and overrule the point of error. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

If the finding is supported by legally sufficient evidence, we must then weigh and consider all the evidence, both that in support of and that contrary to the challenged finding. The jury's finding must be upheld unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor,* 715 S.W.2d 629, 635 (Tex.1986). We may not substitute our opinion for that of the trier of fact merely because we might have reached a different conclusion. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 896 (1951); *Thompson v. Wooten,* 650 S.W.2d 499, 501 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). Further, the jury as trier of the facts is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego v. Brannon* 682 S.W.2d 677, 680 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

Both parties agree that the proper measure of damages in this case are Broughton's lost profits, its net receipts had Texas Gas performed in accordance with the contract. *Osoba v. Bassichis,* 679 S.W.2d 119, 122 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Broughton was awarded the standby rate established by the contract times forty-five, the number of days that Texas Gas used an alternate rig to complete the well. The standby was lower than the day rate paid under the contract when the rig was operational. That sum was reduced by the amount Broughton

saved in expenses not incurred because its rig was not drilling. Texas Gas maintains that the evidence of damages, specifically the amount of costs saved, was not established to a sufficient degree of certainty.

Mr. Broughton was the only witness who testified as to damages. Mr. Broughton was properly designated as an expert witness. Texas Gas did not challenge his qualifications, object to his testifying as an expert, or offer any controverting evidence. Mr. Broughton's testimony was based on his thirty-five years experience in the offshore drilling industry, and his personal experience with the costs incurred for performance of this specific contract. Mr. Broughton testified as to the expenses incurred while the rig was in operation. He stated that certain costs remained constant, but that others were avoidable, or reduced, while the rig was not operational. Mr. Broughton provided estimates of the offsetting savings for each of the itemized expenses.

 Texas Gas is correct that recovery for loss of profits will not be allowed where the facts show that the profits claimed are too uncertain or speculative. *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). However, it is not necessary that lost profits be susceptible to exact calculation. It is sufficient if the evidence allows them to be determined to a reasonable degree of certainty. *Memorial City General Hospital Corp. v. Cintas Corp.*, 679 S.W.2d 133, 137 (Tex. App.—Houston [14th Dist.] 1984, no writ).

The evidence of Broughton's damages was not too uncertain or speculative, and was sufficient to support the jury's answer. Points of error eleven, twelve and thirteen are overruled.

 We find no merit to Texas Gas' assertion in point of error fourteen that the trial court failed to instruct the jury on the proper measure of damages. The jury was instructed "that the proper measure of damages, if any, is the amount which Broughton would have received had the contract been fully performed by Texas Gas, less any costs saved by Broughton as

a result of Broughton not completing operation on the well in question." The instruction provided a proper measure for determining lost profits. *See Osoba*, 679 S.W.2d at 122. Texas Gas concedes that lost profits are the proper measure of damages.

Since the instruction the jury received was a correct statement of the allowable measure of damages, and there was no conflicting or impermissible testimony on the issue of damages, any error in refusing Texas Gas' requested instruction would be harmless. Point of error fourteen is overruled.

 In its fifteenth point of error, Texas Gas alleges the trial court erred in rendering judgment for Broughton and by overruling its motion for new trial; because the damages awarded were excessive since they failed to reflect a reduction due to Broughton's failure to mitigate. Texas Gas contends it is entitled to a remittitur of the amount Broughton could have received had it submitted a bid to complete the well after it was ordered to demobilize its rig.

 Texas Gas had the burden to establish that Broughton could have mitigated and failed to do so. *Houston Chronicle Publishing Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 929 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ). However, the evidence establishes that Broughton had sought other work for the rig, but none was available. Texas Gas' own counsel elicited testimony that Broughton had hired a person whose sole assignment was to locate work for the displaced rig. Contrary to Texas Gas' assertion, Broughton was not required to bid to complete the drilling operation after Texas Gas breached its contractual obligations by ordering the Broughton rig demobilized. Mr. Broughton's testimony that Moore told him Broughton was welcome to bid only if it agreed not to pursue its contractual rights was not disputed. Broughton's duty to mitigate damages did not require that it sacrifice its contractual rights.

There is no evidence that Broughton failed to mitigate its damages. Indeed, the evidence established that Broughton vigor-

ously sought other work for its rig. Point of error fifteen is overruled.

Points of error sixteen through twenty-four challenge the submission to the jury of special issues determining whether Texas Gas was obligated to reimburse Broughton for ad valorem taxes, and the sufficiency of the evidence supporting the jury's answers to those issues. Question No. 2 asked if the jury "[found] from a preponderance of the evidence that Texas Gas breached an obligation, if any, to reimburse Broughton for ad valorem taxes?". Question No. 3 asked the amount, if any, Texas Gas should have reimbursed.

The contract provided for the day rate to be adjusted to reflect changes in Broughton's costs. It reads in pertinent part:

7. *Rate Adjustment.*

"There is shown in Schedule B attached hereto Contractor's defined costs of labor, insurance premiums, and catering as well as other cost items itemized therein ... It is agreed that the rate payable under this Agreement shall be adjusted to reflect change in Contractor's cost or expense of performing under this Agreement as provided therein. Should an increase or decrease occur in items defined in Schedule B, then the Daily Rates set forth in Schedule A, after approval of Operator, may be adjusted on a prorated basis in an amount equal to the cost increase or decrease caused thereby. . . .

The attachment referred to in paragraph 7 and attached to the contract, Schedule A—Rates Of Payment To Contractor, addresses responsibility for state and local taxes. Paragraph (8) of Schedule A provides "[i]n the event any drilling location is within the jurisdictional limits of any state of the United States, [Texas Gas] agrees to indemnify and hold [Broughton] harmless against *all license fees, use, sales, or similar taxes or fees,* levied or assessed by any of such states or any subdivision or agency thereof, on [Broughton] or the Rig and equipment used in connection with or incident to the performance of this Agreement." [Emphasis added].

Texas Gas contends that, as a matter of law, the contract does not require it to reimburse for ad valorem taxes assessed on the rig because the parties did not specifically list them in paragraph (8) of Schedule A. Broughton asserts that ad valorem taxes were not specifically listed because, at the time of negotiation, such taxes had never been assessed on offshore rigs; that the contract language was intentionally left broad enough to encompass unforeseen cost escalations such as newly assessed ad valorem taxes, because the parties intended that Texas Gas pay state and local taxes since they were not accounted for in determining the agreed day rate.

The language used in paragraph (8) indicates that the parties recognized that there may be additional taxes or fees for which Texas Gas would be required to reimburse Broughton. Whether ad valorem taxes should be included is unclear. The trial court stated that it could be interpreted either way. Because the contract is susceptible to more than one meaning, its interpretation was a question of fact. *Coker,* 650 S.W.2d at 394. The issue was properly submitted to the jury.

Schedule B of the contract, defines costs and outlines escalation provisions. It allows adjustment of the daily rate if Broughton's financial burden is substantially increased as a result of any "major change in legislation, regulation, rules, or other mandatory requirements in the Contract Area". Although there was no change in legislation that resulted in assessment of the ad valorem taxes, such taxes had never previously been assessed on offshore rigs. The jury could reasonably have concluded the assessment to be a major change in mandatory requirements in the contract area, and thus reimbursable.

Further, the record established that whether ad valorem taxes would be assessed on the rig depended on the rig's location on the date of assessment. Broughton had no control over the rig's location. Had the rig been operating in Gulf waters outside of state territorial jurisdiction, no taxes would have been assessed. The jury could reasonably have

concluded that since Texas Gas unilaterally controlled the rig's location, in light of the contract as a whole, the parties intended the newly assessed ad valorem taxes to be encompassed by the general language of paragraph (8) of Schedule A.

There is evidence in the record to support the jury's answers to Questions 2 and 3. The trial court properly entered judgment on those answers. Points of error sixteen through twenty-four are overruled.

■ Texas Gas' final point of error and Broughton's cross-point assert that the trial court erred in awarding interest at the rate of 10%. Broughton contends it is entitled to 18% interest, the contractual rate for late paid invoices. Texas Gas counters that the contractual rate applies only to past due amounts for work completed and the amount invoiced by Broughton was not for work completed. Texas Gas argues that the judgment awards Broughton damages for lost profit and the contract contains no agreed interest rates for such damages. Neither does the contract contain a specified formula for determining damages for lost profit. Broughton requested and the jury found damages calculated from the contractual standby rate, but the contract does not specify that as the measure for damages. Broughton could have requested and been awarded damages calculated from the higher contractual operating rates, some compromise between the operating rate and the standby rate, or any other formula that would allow calculation of net profits to a reasonable degree of certainty. The contract contains no measure by which a sum payable could be ascertained for damages for lost profits resulting from Texas Gas' breach.

The trial court properly awarded interest at the equitable rate of 10%. *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex.1988). Point of error twenty-five and Broughton's cross-point are overruled.

The judgment of the trial court is affirmed.