TELETRON ENERGY MANAGEMENT, INC., Appellant,

v.

TEXAS INSTRUMENTS INCORPORATED, Appellee.

No. A14–90–00931–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 3, 1992.

Rehearing Denied Oct. 1, 1992.

Andrew R. Harvin, James E. Doyle, Houston, for appellant.

Jessie R. Pierce, Franci N. Beck, Lawrence Vincient, Warren W. Harris, Houston, Curtis Dyer, Corpus Christi, for appellee.

Before PAUL PRESSLER, SEARS and ELLIS, JJ.

## OPINION

ELLIS, Justice.

Teletron Energy Management, Inc. ("Teletron") seeks reinstatement of the jury's award of $500,000 in lost profits and additional damages under the Texas Deceptive Trade Practices Act (DTPA), or, alternatively, a new trial in its suit against Texas Instruments Inc. ("TI") for failing to timely produce ten (10) working preproduction units of a programmable thermostat ("the T–2000") for Teletron to use in a computerized energy management system. Attributing 65% of the negligence that proximately caused Teletron's damages to TI, the jury found that TI breached its express warranty to Teletron and misrepresented its engineering services. The jury awarded Teletron actual damages of $100,000 for reasonable and necessary expenses in developing and promoting the T–2000, plus $500,000 for net profits lost prior to trial. The jury also found that Teletron should be awarded additional damages of $1,500,000 since TI "knowingly" committed deceptive practices. The trial court granted TI's motion for judgment notwithstanding the verdict on the award of lost profits and rendered judgment for Teletron for $100,000 in expenses, $200,000 in additional damages under the DTPA, TEX.BUS. & COM.CODE ANN. § 17.50 (Vernon 1968 & Supp.1992), and attorneys' fees. In nine points of error, Teletron contends (1) the evidence is sufficient to support the jury's finding of $500,000 in past lost profits; (2) the jury's findings of only $100,000 in expense damages,

no future lost profits, no gross negligence, and no fraud are against the great weight and preponderance of the evidence; and (3) the trial court erred in refusing to submit instructions to the jury regarding TI's violation of a state statute that prohibits misrepresenting engineering services.

First, we shall address what TI terms a "reply point" that this Court has no authority to consider the Statement of Facts because it was not timely filed. TEX.R.APP.P. 54. Through September 30, 1991, this Court granted Teletron eight unopposed motions for extensions of time due to the official court reporter's failure to complete the Statement of Facts. On October 9, Teletron sought another extension, also unopposed, and for good cause shown the Court extended the time for filing the Statement of Facts until November 9. When the court reporter did not appear at the October 9 show cause hearing, the Court granted the extension of time until December 2. On November 21, ten days prior to December 2, the Court on its own motion reset the deadline until December 18 to coincide with the appearance of the court reporter ordered in the Court's mandamus proceeding against her. Due to a clerical error, the November 21 extension, which the Court intended to apply to the appeal, was entered under the cause number of the mandamus proceeding. This was corrected as shown on a postcard from the Clerk acknowledging that the Statement of Facts was filed on December 6. The filing of the Statement of Facts twelve days before the final deadline made it unnecessary for Teletron to file an additional motion for extension of time. Therefore, we consider the merits of the appeal.

Samir Soliman, an engineer, incorporated Teletron in 1983 to manufacture and market a microprocessor-based energy management system designed to provide substantial savings in the heating, ventilating and air-conditioning of residential and light-commercial facilities. Teletron's first product was to be a state-of-the-art programmable thermostat, the T–2000. Soliman retained Electronic Concepts, Inc. ("ECI") to translate his design into microcomputer

**308**

language, and Teletron interviewed Motorola, RCA, National Semiconductor and TI to select a customized microprocessor as the "brain" for the T–2000. TI's Regional Technology Center (the "RTC") in Dallas claimed that it had already built, designed, and marketed a thermostat. However, according to Larry Blackburn, an engineering manager at TI, the RTC did not reveal to Teletron that this would be only the third or fourth project the RTC had ever worked on for an outside customer, or that none of its "engineers" were licensed with the State of Texas as professional engineers.

By letter dated July 19, 1983, Teletron accepted the RTC's proposal to build the T–2000 in eight weeks for the sum of $20,000. On October 17, Teletron delivered its final specifications for the T–2000 to the RTC, and it agreed to a three-week extension and an increase of $12,000 to make certain revisions.

Teletron paid TI two installments totaling $15,000 and proceeded to establish a distributorship network, order parts, and promote the T–2000 in local and national publications. However, despite repeated assurances, TI did not complete the project in eleven weeks, nor by the next promised completion date of March 15. On April 30, 1984, the RTC stated in writing that the project would be completed as of June 8, 1984. On June 6, the RTC advised Teletron in writing that it had completed the design of hardware and software for the T–2000 and that the preproduction units functioned correctly. Shortly thereafter, Ansel Goldgar, the RTC manager, advised Teletron to proceed with plans for a product announcement party on July 24. But when Goldgar and Blackburn arrived at the party on July 24, they did not bring a completed product. In fact, a year passed without Teletron receiving a satisfactory unit. On September 30, 1985, TI notified Teletron that it would do no more work on the project, and it requested payment of $22,200 on "remaining design services charges." By that time, Teletron was financially drained; it had lost distributors, credibility, and the "window of opportunity" to market the T–2000.

In points of error one through four, Teletron contends that it is entitled to future lost profits as well as the $500,000 in lost profits before trial that the jury awarded. Regarding Teletron's damages, the jury answered Question No. 24 as follows:

What sum of money, if any, do you find would fairly and reasonably compensate Teletron for its actual damages, if any?

(a) Reasonable and necessary expenses incurred in developing, marketing and promoting the Teletron 2000.
ANSWER: $100,000.
(b) Net profits lost in the past.
ANSWER: $500,000.
(c) Net profits lost in the future.
ANSWER: $0.

In its "Motion to Disregard a Jury Finding and for Judgment N.O.V., or Alternatively, Motion for Judgment on the Verdict," Teletron complained about the jury's answer to Question 24(a) but moved "for judgment based upon the jury's findings to all other questions." A motion for judgment on the verdict prevents the moving party from taking a position inconsistent with that part of the judgment on appeal. *Litton Indus. Prod., Inc. v. Gammage*, 668 S.W.2d 319, 322 (Tex.1984). Therefore, by failing to challenge the jury finding when it moved for judgment on the verdict, Teletron waived the issue of future lost profits. Accordingly, we overrule Teletron's contentions regarding future lost profits.

Regarding past lost profits, TI contends that, as a matter of law, a new and unestablished business cannot recover lost profits:

The rule denying a recovery where the facts show that such profits claimed are too uncertain or speculative, or where the enterprise is new or unestablished, is still enforced, on the ground that the profits which might have been made from such business are not susceptible of being established by proof to that degree of certainty which the law demands.

*Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). TI is correct that recovery for lost profits will

not be allowed where the facts show that profits claimed are too uncertain or speculative.[1] However, it is not necessary that lost profits be susceptible to exact calculation. It is sufficient if the evidence allows them to be determined to a reasonable degree of certainty. *Texas Gas Exploration Corp. v. Broughton Offshore Limited II,* 790 S.W.2d 781, 789 (Tex.App.—Houston [14th Dist.] 1990, no writ) (holding evidence "not too uncertain or speculative"); *Memorial City Gen. Hosp. Corp. v. Cintas Corp., No. 81,* 679 S.W.2d 133, 137–38 (Tex. App.—Houston [14th Dist.] 1984, no writ) (holding evidence not "too uncertain or speculative"). In fact, most jurisdictions and the Restatement (Second) of Contracts § 352 (1981) have rejected the "new business rule" of per se exclusion in favor of a more sensible approach whereby a new or unestablished business may establish damages with reasonable certainty with the aid of expert testimony, financial data, market surveys, and the like. Todd R. Smyth, *Annotation, Recovery of Anticipated Lost Profits of New Business: Post–1965 Cases,* 55 A.L.R.4th 507 (1987). Although a number of Texas cases have followed the new business rule,[2] more recent cases recognize that a new business may recover its lost profits if factual data is available to furnish a sound basis for computing probable losses. *E.g., Orchid Software, Inc. v. Prentice–Hall, Inc.,* 804 S.W.2d 208, 210 (Tex.App.—Austin 1991, writ denied) (citations omitted); *Pena v. Ludwig,* 766 S.W.2d 298, 301 298, 301 (Tex.App.—Waco 1989, no writ). As this Court has stated, the rationale of the new business rule is merely to "eliminate that uncertainty, conjecture, and speculation in establishing a measure of damages." *Anbeck Co. v. Zapata Corp.,* 641 S.W.2d 608, 616 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Actually, TI concedes that even a new business may be able to demonstrate a reasonably certain basis for determining lost profits. *E.g., Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340 (1955) (citations omitted); *Harper Bldg. Sys., Inc. v. Upjohn Co.,* 564 S.W.2d 123 (Tex.Civ. App.—Beaumont 1978, writ ref'd n.r.e.). In *Pace Corp.,* a business established on the strength of a contract was discontinued because of its breach. *Id.* 284 S.W.2d at 348. The supreme court reasoned that "damages awarded [Pace] were, in large measure, speculative, but *the same could be said of any recovery of lost profits.*" *Id.* (emphasis added.) Moreover, "[a] party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Id.* (citing *Southwest Battery Corp,* 115 S.W.2d at 1099). In *Harper,* the court of appeals reinstated the jury's award of $250,000 because "it could not reasonably be said that the profits were entirely too speculative and conjectural as to allow recovery therefor." 564 S.W.2d at 126–27.

A trial court errs in granting judgment n.o.v. when some evidence exists to sustain the jury's answer. TEX.R.CIV.P. 301. On appeal, a judgment n.o.v. will be sustained only if there is no evidence to support the jury's finding. The appellate court must view the testimony in the light most favorable to the jury's answer, indulging every reasonable inference in favor of the jury's answer. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983). Any contrary evidence and inferences must be

---

**1.** This is true, as well, when the parties are established businesses. In *Lovelace v. Sabine Consolidated, Inc.,* this Court held the evidence offered at trial consisted merely "of speculation stacked upon speculation." 733 S.W.2d 648, 656 (Tex.App.—Houston [14th Dist.] 1987, writ denied). By contrast, in *Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.,* there was "sufficient factual data from which the jury could ascertain lost profit with reasonable certainty." 748 S.W.2d 309, 313 (Tex.App.—Houston [14th Dist.] 1988, no writ).

**2.** *E.g., Keener v. Sizzler Family Steak Houses,* 597 F.2d 453 (5th Cir.1979) (applying Texas law); *Norris v. Bovina Feeders, Inc.,* 492 F.2d 502 (5th Cir.1974) (applying Texas law); *Atomic Fuel Extraction Corp. v. Estate of Slick,* 386 S.W.2d 180 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r.e.) (applying "general rule" denying damages for lost profits to a business that has not been "in actual operation long enough to give it permanency and recognition;" holding that "operation of a business at a loss fails to meet the test"); *Ganda, Inc. v. All Plastics Molding, Inc.,* 521 S.W.2d 940 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.).

disregarded. *Dodd v. Texas Farm Prod. Co.*, 576 S.W.2d 812, 814–15 (Tex.1979).

■ Considering the evidence in the light most favorable to the jury finding, in accordance with the standard of review cited above, the record reflects that the T–2000 had wide market appeal. In fact, TI itself projected that it would earn hundreds of thousands of dollars from the sale of parts to Teletron to manufacture the product. Teletron's expert, Dr. Edward Williams, and other witnesses explained that no other product "came near doing what the T–2000 did." Thirty-thousand mailers sent to three areas of the Houston test market generated responses at the rate of 11% from Pasadena, 13% from Memorial, and 14% from Sharpstown. Dr. Williams considered this "a very high response rate," compared to a normal response rate of one-half to one percent. "Several hundred" of the respondents were contacted by one of the distributors, resulting in 120 sales. Overall, the "closure rate" was 60 percent; in the words of the expert:

> Sixty percent of the people that responded, when [contacted] said, "Yes, I'll buy one," or "Please send one out to me, come out and install one."

Therefore, Dr. Williams estimated, the market for the T–2000 would be approximately 6.6% to 8.4% of households in the Houston area.

The T–2000 was heavily promoted, with advertisements in the *Houston Chronicle, Houston Post,* and *Wall Street Journal* newspapers. An editorial in a trade publication generated 137 unsolicited responses, with many respondents asking how to become a distributor. Nine companies contracted to pay $25,000 each to become distributors for the T–2000, and eight individuals paid $7,000 each to become a dealer. Teletron contends that the distributorship agreement obligated each distributor to purchase fifty T–2000 units per month; however, the agreement merely states, "Distributor acknowledges that units purchased by said Distributor are expected by Company to average not less than fifty (50) 'TELETRON 2000' during each thirty (30) day period." [3] Although not contractually bound to purchase fifty units per month, this was clearly the parties' objective. Furthermore, a distributor who testified stated "with the response we were getting" that "it didn't appear like we would have any problem" selling 200 units per month.

■ The measure of damages for loss of profits is net profits, which is defined as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 466 (Tex.App.—Dallas 1988, *writ denied per curiam,* 778 S.W.2d 865 (Tex.1989). Two reasonable methods the jury might have used to calculate Teletron's lost profits include: (1) if each of the nine distributors purchased only 50 units per month—the amount expected for them to buy—over the course of a year, at Teletron's net profit margin of .37, Teletron would have netted $500,000; and (2) if each of the nine distributors purchased 200 units per month—the amount that a distributor testified that "it didn't appear like we would have any problem" selling per month—over the course of three months, at the net profit margin of .37, Teletron would have netted $500,000.

TI contends that, by Soliman's own admission, Teletron would have had to sell 7,320 units per year just to break even, and that it never came close to doing so. However, that is contrary evidence that must be disregarded in this Court's review of the case. Furthermore, it is the jury's province to resolve conflicts and inconsistencies in the testimony of a witness: the jury may believe one part of the testimony while rejecting another. *Creech v. Thompson,* 156 Tex. 561, 297 S.W.2d 817, 820 (1957). In addition, since sales were thwarted by TI's wrongful conduct, the 7,320 projection is not a valid yardstick; otherwise, according to Dr. Williams, Teletron could reasonably have sold 32,400 units in 1984 alone.

---

**3.** In contrast, other paragraphs in the agreement state that the distributor "agrees" to purchase certain items, "shall" conduct his business as an independent business, "agrees" to follow procedures outlined in Teletron's installation manuals, etc.

He explained that Teletron had an attractive product and a good dealer support system, so that with a working product, signing up thirty distributors in the first year would not have been difficult at all. In addition, the jury was entitled to consider Dr. Williams' testimony that

> if sales indeed were as low as 7,500 units roughly, you might be able to tear down some of those fixed costs. Those, in fact would become what is known as semi-variable, semi-fixed. And, indeed that could reduce this break-even point even below what it is now.

TI also dismisses the testimony of Dr. Williams as based on nothing more than Soliman's subjective hopes and projections. To the contrary, Dr. Williams also interviewed Teletron's financial analyst and a distributor, and he concluded that they had engaged the appropriate way to test the market size for the T–2000. Likewise, TI praised Teletron's "thorough market study." Having evaluated the data that was compiled, Dr. Williams testified that the market survey showed "living, breathing individuals who will buy the product." The objective evidence introduced at trial—including market data, expert testimony, and sales to both consumers and distributors—easily supports the jury's award of $500,000 for past lost profits. Therefore, we sustain appellant's points of error contending the trial court should not have granted TI's motion for judgment notwithstanding the verdict.

■ In point of error number five, Teletron contends the jury's award of only $100,000 in expense damages is against the great weight and preponderance of the evidence. This point requires our consideration of all of the evidence, both in support of and contrary to the jury's finding. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651–52 (Tex.1988); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Evidence contrary to the finding must "greatly outweigh" the evidence in support of the verdict. *Id.* If the jury was presented with evidence sufficient that reasonable minds could differ, we may not substitute our opinion for that of the jury merely because we may have reached a different conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 213 (Tex.App.—Houston [14th Dist.] 1991, no writ).

Teletron maintains that it incurred $1,348,653.43 in developing, marketing, and promoting the T–2000, and it argues that TI disputes only $143,984.56 of that amount. However, TI responds that it should not be held liable for every penny that Teletron spent while in business. The jury was entitled to attribute some of Teletron's damages to problems caused by poor assembly of the thermostats, improper installation of the units, service problems by a distributor, the failure of its advertising company to perform, and defective components. In addition, there must be evidence of the reasonableness and necessity of amounts that were paid. Here, Soliman's testimony supporting the reasonableness and necessity of Teletron's expenses rested on his credibility, of which the jury was the exclusive judge. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 549 (1962). We hold that, among the wealth of testimony, there was ample evidence which, if believed, would enable the jury to limit TI's liability to only $100,000 of the expenses Teletron incurred in developing, marketing, and promoting the T–2000. Therefore, we overrule appellant's fifth point of error.

Next, Teletron contends the trial court erred in refusing to instruct the jury that TI violated sections 1 and 18 of the Texas Engineering Practices Act ("TEPA"), TEX. REV.CIV.STAT.ANN. art. 3271a (Vernon 1968), by misrepresenting RTC's engineering services. Those sections of the TEPA provide, *inter alia*, that:

> [O]nly licensed and registered persons shall practice, offer or attempt to practice engineering or call themselves or be otherwise designated as any kind of "engineer" or in any manner make use of the term "engineer" as a professional, business or commercial identification, title, name, representation, claim or asset
>
> . . .

\* \* \* \* \* \*

No firm, partnership, association, corporation or other business entity shall hold itself out to the public or any member thereof as being engaged in the practice of engineering ... unless ... any and all services, works, acts or things performed or done by it which constitute any part of the practice of engineering are either personally performed or done by a registered engineer or under the responsible supervision of a registered engineer.

Teletron also asked the trial court to instruct the jury that TI's conduct in violating a state statute constituted negligence as a matter of law. *See, e.g., El Chico Corp. v. Poole,* 732 S.W.2d 306, 312 (Tex. 1987); *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985).

TI cites *Boaz v. White's Auto Store,* 141 Tex. 366, 172 S.W.2d 481 (1943), for the proposition that a jury should not be informed of a statutory violation when it is (1) not "necessary to enable the jury to properly pass upon and render a verdict," and (2) "calculated to prejudice one of the parties before the jury." However, in *Boaz,* the trial court's instruction informing the jury that the defendant driver *"was guilty of negligence* ... in immediately approaching said intersection ... in excess of 25 miles per hour" was unnecessary for the jury to pass properly on the special issue posed, which inquired whether the driver's rate of speed was a proximate cause of the collision. 172 S.W.2d at 483 (emphasis added).

■■■ On the other hand, Teletron is not entitled to a new trial unless the trial court's error amounted to such a denial of its rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Texas Dept. of Human Servs. v. White,* 817 S.W.2d 62, 63 (Tex.1991); *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); TEX.R.APP.P. 81(b)(1). Teletron maintains that had the jury been instructed that TI violated a state statute—that the law prohibits those in this line of work from claiming to be engineers when they are not—then the jury would have found that TI's conduct was

the result of gross negligence and/or fraud. However, having heard the evidence regarding the misrepresentation of TI's engineering services, the jury did find that TI *knowingly* committed certain DTPA violations. The jury considered the same evidence in concluding that TI did not commit fraud or gross negligence. Under these facts, we cannot conclude that an instruction by the trial court would necessarily have caused the jury to reach a different verdict. Therefore, we overrule points of error six and seven.

■■■ In points of error eight and nine, Teletron contends the jury's findings that TI was not grossly negligent and did not commit fraud were against the great weight and preponderance of the evidence. Again, there is evidence which, if believed, supports TI's claim that it tried to work around situations that it did not control, including poor assembly of the units, manufacturing errors, and improper handling. Rather than conceding fraud or gross negligence, TI's evidence tended to show that it worked to solve a complicated engineering puzzle while Teletron refused to accept advice from TI that might have eliminated some of the units' problems. We hold that the jury's finding was not against the great weight and preponderance of the evidence. Points of error eight and nine are overruled.

The judgment of the trial court is reversed as to the portion regarding damages for past lost profits. In addition to the amount previously awarded, appellant is entitled to recover from appellee damages for past lost profits, plus prejudgment and post-judgment interest.

SEARS, Justice, dissenting.

I respectfully dissent. Under Texas law, a party may not recover lost profits (1) where the enterprise is new or unestablished, or (2) where the profits claimed are too uncertain or speculative. *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 427, 115 S.W.2d 1097, 1098–99 (1938). For both of these reasons, I would hold that the trial court correctly entered judgment notwithstanding the jury's award of $500,000 for

lost profits. In all other respects, I agree with the majority that the case should be affirmed.

First, Teletron may not recover damages for lost profits because it was a new and unestablished enterprise that lacked any track record of profitability. *Norris v. Bovina Feeders, Inc.*, 492 F.2d 502 (5th Cir. 1974) (hoped-for profits of new business leave too much to speculation and conjecture); *Davis v. Small Business Invest. Co.*, 535 S.W.2d 740 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.) (no evidence that company could ever have made a profit); *Ganda, Inc. v. All Plastics Molding, Inc.*, 521 S.W.2d 940 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.) (profits of new and unestablished business not susceptible of being established by proof with requisite degree of certainty). Teletron never produced a marketable product, and it never made a profit in any year of operation. At most, it sold between seven hundred and 1,000 thermostats, yet by its own admission, it would have had to sell 7,320 units a year just to break even. Teletron's sales never approached that figure.

Second, the "lost profits" claimed by Teletron are too uncertain or speculative to measure. "[T]o award as damages the hoped-for profits of a new and unestablished business is to leave too much to conjecture and speculation." *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 536 (Tex.App.—Corpus Christi 1979, writ ref'd n.r.e.) (citations omitted). Teletron's profit and loss statements derived from pro forma "projections" developed in 1983, and the testimony supporting Teletron's claim of damages for lost profits stemmed solely from the ambitious speculations of its founder, Samir Soliman. "[T]o recover lost profits, damages must be shown with 'reasonable certainty;' net profits must be shown by *objective*, rather than *subjective*, facts, figures, and data." *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 466 (Tex. App.—Dallas 1988, *writ denied per curiam*, 778 S.W.2d 865 (Tex.1989) (emphasis in original). Teletron's expert, Dr. Edward Williams, admitted that Soliman's unsubstantiated "projections" formed the basis of his analysis; that he did not interview any consumers, manufacturers, or independent distributors or dealers; and that he neither questioned nor altered Soliman's speculations. Dr. Williams relied on information given to him by Soliman and other Teletron employees or shareholders to arrive at his faulty conclusions. He never solicited or obtained any outside or non-biased opinions or records. Even when declared reasonable by Dr. Williams, Teletron's *subjective* hopes and *speculations* are insufficient to support the jury's award of lost profits. *See Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 258–59 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.); *Fenwal, Inc. v. Mencio Sec., Inc.*, 686 S.W.2d 660, 665 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). Such "speculation stacked upon speculation" is no evidence. *Lovelace v. Sabine Consol., Inc.*, 733 S.W.2d 648, 656 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

Teletron has failed to show a reasonable basis for determining any lost profits. For example, Teletron did not have contractual commitments from buyers. Soliman merely *assumed* in his projections that Teletron would sell at least 200 units per month to each of its distributors, and he *speculated* that Teletron could interest thirty distributors in Texas to sell 32,400 thermostats in its first year. Based on Soliman's "projections," Teletron hoped to add forty-two distributors in its second year by expanding into other major Texas cities. Further, Teletron dreamed of adding forty-eight additional distributors in the third year by extending into other regions. However, the record shows that Teletron lined up only nine distributors to take on the T–2000—as a sideline product—and, at trial, Soliman could identify only two of them as still being in business. Further, the agreement that allegedly committed each distributor to purchase 200 units per month placed no contractual or legal obligation on a distributor to buy or sell any minimum number of thermostats on any regular basis. The agreement merely stated, "Distributor acknowledges that units purchased by said Distributor are *expected* by Company to average not less than fifty (50) 'TELE-

TRON 2000' during each thirty (30) day period" (emphasis added). In contrast, the agreement's true commitments imposed actual obligations on the distributor through affirmative language.

In addition, because of the so-called "uniqueness" of Teletron's product, it did not have a similar business to which a comparison could be made for determining lost profits. *Cf. Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 347–50 (1955); *Pena v. Ludwig,* 766 S.W.2d 298, 301–04 (Tex.App.—Waco 1989, no writ). Teletron also failed to provide sufficient factual proof of anticipated sales had Texas Instruments not breached its contract with Teletron. *E.g., Fleming Mfg. Co. v. Capitol Brick, Inc.,* 734 S.W.2d 405, 407–08 (Tex.App.—Austin 1987, writ ref'd n.r.e.); *Mesa Agro v. R.C. Dove & Sons,* 584 S.W.2d 506, 512 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.).

For the foregoing reasons, I agree with the trial court that there is no evidence to support the jury's award of $500,000 in lost profits, and I would affirm the judgment in its entirety.